# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MELVIN H. FRANCIS** | * | **CIVIL ACTION NO.:  2:20-cv-00997** |
| | * | |
| *Plaintiffs* | * | **SECTION: A(2)** |
| | * | |
| **VERSUS** | * | **JUDGE JAY C. ZAINEY** |
| | * | |
| **ITG BRANDS, LLC, ET AL.** | * | **MAG. DONNA PHILLIPS CURRAULT** |
| | * | |
| *Defendants* | * | |

**************************************

## UNION CARBIDE CORPORATION'S
## PRELIMINARY WITNESS LIST

NOW INTO COURT, through undersigned counsel, comes Defendant, Union Carbide Corporation (hereinafter referred to as "Union Carbide"), and files its Preliminary Witness List as follows, as follows:

## I.    INTRODUCTION

Discovery in this case is ongoing and has not been completed.  As such, Union Carbide has not had the opportunity to fully discover and explore the facts and issues in the instant matter. Union Carbide is not aware of all of the areas of testimony or evidence that Plaintiffs, Catherine Francis, Charmaine Rowan, Melvin Francis, Jr., or Cross-Claim Plaintiff, Huntington Ingalls Incorporated, f/k/a Northrop Grumman Shipbuilding, Inc., f/k/a Northrop Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc., f/k/a Avondale Shipyards, Inc., f/k/a Avondale Marine Ways, Inc. (hereinafter referred collectively as "Plaintiffs") intend to produce at trial, and, therefore, Union Carbide cannot proffer all expected testimony until it has had the benefits of discovery and of reviewing all of Plaintiffs' expert reports, opinions and pathology materials.  Furthermore, Plaintiffs have not provided any substantiation of the claims at issue, or any evidence to suggest a

connection between Melvin H. Francis, Sr.'s alleged asbestos related illness(es) and Union Carbide. As such, Union Carbide reserves its right to amend, modify, alter, supplement and/or otherwise change the designations listed herein prior to trial.

## II.   EXPERT WITNESSES

1. ROBERT ADAMS, CIH, CSP
Environ International Corp.
214 Carnegie Center
Princeton, NJ 08540

Mr. Adams is a certified industrial hygienist, as well as a certified safety professional. He received his B.S. in Biology from Clarion University of Pennsylvania in 1980 and a Master of Science in Safety Sciences from Indiana University of Pennsylvania in 1991. He is currently a Principal at ENVIRON in Princeton, New Jersey and has more than 30 years of experience in Environmental Health and Safety in both the public and private sectors. Prior to joining ENVIRON, Mr. Adams held a variety of public and private positions, including Director – Environmental Health and Safety Services Bureau, City of New York Department of Design and Construction, Long Island City, New York. He is a fellow of the American Industrial Hygiene Association. His qualifications are set forth in greater detail in his curriculum vitae, which will be furnished upon request.

Mr. Adams is expected to discuss general industrial hygiene principles and the role of the industrial hygienist in occupational airborne sampling, as well as the interpretation of the results of any such sampling. He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases. He may also discuss generally accepted and reliable methodologies within the field of industrial hygiene.

Mr. Adams will address the exposures of persons who perform drywall and joint compound work, bystanders (those in the vicinity of workers using the products), and persons in the households of exposed persons or those otherwise secondarily exposed to asbestos as those exposures are reported in both the peer-reviewed and unpublished literature. Mr. Adams may testify that epidemiological studies have demonstrated that exposure to amphibole forms of asbestos presents a significant risk of lung cancer and mesothelioma. In contrast, epidemiological studies have shown that exposure to chrysotile does not present a significant risk of asbestosis, lung cancer, or malignant mesothelioma at the exposure levels seen in drywall workers.

Mr. Adams may testify that "asbestos" is a generic term for a group of naturally occurring fibrous minerals and that the two major groups of asbestos—serpentine and amphiboles—have different physical forms and clearance rates after deposition in human lungs. Mr. Adams may explain how industrial hygienists use dose-response evidence of asbestos exposure and disease to determine whether an exposure increases the risk of disease and the importance of toxicity variants in different types of asbestos. He may

address issues related to fiber type, including without limitation physical and chemical structure, biopersistence, potential tremolite contamination, the ability of various fiber types to increase disease risk, and how fiber type distinctions are important in industrial hygiene. Mr. Adams may also testify about the relative potency of various asbestos fiber types and asbestos-related diseases and the risks, if any, associated with asbestos by fiber type. As part of this testimony, Mr. Adams may discuss fiber potency estimates in the scientific literature, including those presented in the papers of Hodgson & Darnton and Berman & Crump, among others.

Mr. Adams may further testify in the areas of retrospective exposure assessment, health risk assessment, the relative and absolute potentials of various asbestos products to produce respirable asbestos dust, industrial hygiene and environmental standards and their basis, control technology and process-specific aspects of exposure, analytical chemistry, asbestos-related measurement techniques, general industrial hygiene issues, including the effects of ventilation and distance on exposure, and related subjects.

Based on the particular circumstances of Plaintiff's exposure, he may testify as to Plaintiff's likely TWA exposures to asbestos as well as his cumulative asbestos exposure and how those exposures compare to historic and current permissible exposure limits, threshold limit values, and ambient exposures reported in the peer-reviewed and unpublished literature. Mr. Adams may testify as to whether Plaintiff's alleged exposures to asbestos created a significant risk for the development of an asbestos-related disease. Mr. Adams may testify about the size, construction, layout and working environment of facilities such as those where Plaintiff worked, based on a review, as appropriate, of available workplace documents; Plaintiff's employment records and testimony; coworker testimony; industrial hygiene surveys at worksites; and literature and studies describing exposures associated with different work practices.

Mr. Adams may discuss the studies conducted by Bernstein, et al. These studies demonstrate the rapid clearance of chrysotile as compared to amphiboles.

Mr. Adams may also testify concerning what information was known within the scientific community regarding potential asbestos health hazards at various times and the evolution and applicability of various governmental regulations and guidelines relating to asbestos. He may also address union knowledge of asbestos hazards, and the historical development of the use of respirators.

Mr. Adams may be asked to offer opinions concerning the nature and extent of exposure to asbestos-containing joint compound dust. He may also testify concerning the concept of time-weighted average as applied to exposures to such dust and its relationship to permissible exposure limits.

Mr. Adams may also be asked to respond to the testimony and documents of witnesses offered at the time of trial or in deposition, including, but not limited to, testimony of witnesses offered by Plaintiff.

Mr. Adams may discuss product formulas and the asbestos requirements for products identified by Plaintiff and/or coworkers.

Mr. Adams's testimony will be based on his education, training, professional experience, and review of the relevant medical and scientific literature, as well as on his review, to the extent available, of Plaintiff's work history, employment records, relevant worksite materials, and other pertinent discovery documents.

2.  RICHARD LUTHER ATTANOOS, B.Sc., Mb Bs, F.R.C. Path.
    Department of Histopathology
    Llandough Hospital
    Penarth, South Glamorgan CF64 2XX
    United Kingdom

Dr. Attanoos is a pathologist with a special interest in thoracic pathology.  He received his MB BS (physician's degree) from Charing Cross and Westminster Medical School at London University in 1987 and was awarded Fellowship in the Royal College of Pathologists in Histopathology in 1993.  Dr. Attanoos is an invited member of the International Mesothelioma Panel, European Mesothelioma Panel, and the Asbestosis Committee of the College of American Pathologists/Pulmonary Pathology Society. Since 2007, Dr. Attanoos has been a member of the Research Council of the British Mesothelioma Interest Group.  In 2008, Dr. Attanoos was enlisted as a medical advisor to the All-Party Parliamentary Committee of the British government on the Health Effects of Asbestos.  He has published approximately 100 papers in the peer-reviewed medical and scientific literature, many of which are in the fields of occupational lung disease, asbestos, lung cancer, and mesothelioma.

Dr. Attanoos may testify as to the general medical aspects of the diagnosis and treatment of lung cancer and mesothelioma and the pathological effects of asbestos on the lung. He may also testify as to the relationship of asbestos exposure and the incidence of the conditions alleged by Plaintiff, including pleural plaques, lung cancer, and mesothelioma.  Dr. Attanoos may testify that "asbestos" is a generic term for a group of naturally occurring fibrous minerals. Dr. Attanoos may testify that there are two major groups of asbestos - serpentine and amphiboles - which have different physical forms and clearance rates after deposition in human lungs.  Dr. Attanoos may testify that the serpentine group contains one form of asbestos - chrysotile - and that the amphibole group contains several forms of asbestos - including crocidolite, amosite, tremolite, actintolite, and anthophyllite.  Dr. Attanoos may testify regarding the differing potential of these various forms of asbestos to cause conditions alleged by Plaintiff, including pleural plaques, lung cancer, and mesothelioma.  Dr. Attanoos may testify generally regarding the role that the size, structure and chemical composition of different types of asbestos fibers plays in their ability, or lack thereof, to cause conditions alleged by Plaintiff. Dr. Attanoos may testify generally regarding the role of dose in determining whether certain types of asbestos fibers can cause or contribute to conditions alleged by Plaintiff. Dr. Attanoos may testify generally regarding the latency periods associated with asbestos-related conditions alleged by Plaintiff. Dr. Attanoos may testify regarding the evidence that exposure to

4

amphibole asbestos explains the incidence of certain asbestos-related disease among individuals exposed to chrysotile asbestos.

Dr. Attanoos may also testify regarding "Calidria" asbestos, the type of asbestos mined and sold by this Defendant. Dr. Attanoos may testify that Calidria is a unique form of short fiber chrysotile asbestos that is tremolite-free. Dr. Attanoos may testify that, because of its unique properties, Calidria could neither cause nor contribute to the conditions alleged by Plaintiff.

Dr. Attanoos may also testify regarding the diagnosis of any purportedly asbestos-related disease or condition alleged by Plaintiff and respond to testimony by any of Plaintiff's experts regarding the same. Dr. Attanoos may also testify regarding other probable or possible causes of any disease or condition alleged by Plaintiff, including but not limited to, smoking where relevant.

Dr. Attanoos is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

Dr. Attanoos may also offer testimony to refute any medical causation testimony that may be offered by Plaintiff's treating physicians and/or expert witnesses, and any assertions made in the Complaint, deposition testimony, discovery responses and other pleadings.

Dr. Attanoos may testify in accordance with any deposition which he may be required to give and also refer to models, charts, photographs, illustrations, drawings or other demonstrative aids or exhibits as appropriate to illustrate and explain his testimony or as foundation for his testimony.

3.  (a)  KENNETH BOUDREAUX, Ph.D.
          1424 Bordeaux Street
          New Orleans, LA  70115
    (b)  DAN CLIFFE
          5210 Pitt Street
          New Orleans, LA 70115
    (c)  STUART WOOD
          500 Arlington Drive
          Metairie, LA 70001

Dr. Boudreaux and/or Dr. Wood and/or Mr. Cliffe may testify in the areas of economics and the appropriate valuation of damages, if necessary. They may also comment and testify regarding the opinions of Plaintiffs' experts. Dr. Boudreaux and/or Dr. Wood and/or Mr. Cliffe reserve the right to testify regarding any and all other areas set forth in their Curriculum Vitae.

4.   BRUCE W. CASE, M.D.
Dept. of Pathology
Montreal General Hospital
Rm. C3-157
1650 Cedar Ave. W.
Montreal, QC H3GlA4.

Dr. Bruce Case is an expert physician, with particular expertise in pathology, in the process of carcinogenesis, as a researcher in the field of asbestos related conditions and their etiology, in the pathologic diagnosis and grading of non-malignant conditions associated with exposure of certain populations to asbestos-containing products and/or materials, and in the epidemiologic and etiologic aspects of certain cancers that are alleged to be causally associated with exposure of certain populations to asbestos containing products and/or materials.

Dr. Case is expected to provide testimony concerning the anatomic structure and functioning of the lung from a pathologic perspective, the defense mechanisms and functioning of the lung in health and otherwise, the responses of the lung to various stimuli, and the role of various components of the respiratory system in the proper functioning of the lung.

Dr. Case is expected to testify concerning the circumstances under which exposure to certain forms and types of asbestos may be associated with the incidence of some forms of lung cancer and mesothelioma in some persons, and will testify concerning the results of his own experiences, the medical and scientific literature, and existing epidemiologic studies concerning associations that are alleged to exist epidemiologically between exposure to asbestos in some populations and the mortality and/or incidence of some forms of cancer.

Dr. Case is also expected to testify as to the specific requirements necessary for an exposure to be considered a "substantial contributing factor." Dr. Case will testify as to the results of his fiber burden and analysis in this case, if appropriate and sufficient tissue is available. It is expected that Dr. Case's testimony generally will respond to the pathologic, scientific and epidemiologic testimony that may be offered by Plaintiff's experts, and in that sense his testimony is dependent upon the prior testimony of such experts and cannot be specifically predicted.

Dr. Case is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

5.  WILLIAM DYSON, Ph.D.
WorkPlace Hygiene
1022 Jefferson Road
Greensboro, NC 27410

Dr. Dyson is a certified industrial hygienist.  Dr. Dyson may testify about industrial hygiene and threshold limit values, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques.  Dr. Dyson may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos release and exposure.  Dr. Dyson may also testify about the development of knowledge regarding the dose-response relationship between exposure to asbestos and disease, and other related matters.

Dr. Dyson is expected to testify about the principles of industrial hygiene and the factors that are important to industrial hygiene studies.  He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases.  Dr. Dyson is expected to testify as to the manner in which industrial hygiene data should be considered in evaluating exposures.

Dr. Dyson may testify regarding the level of asbestos dust and the types of asbestos fibers that Plaintiff may have been exposed based on review of available work place documents, employment records and testimony, co-worker testimony, industrial hygiene surveys of work sites, and/or hypothetical facts presented at the time of trial.

Dr. Dyson may also testify concerning the sale by Union Carbide of asbestos and the uses of asbestos sold by Union Carbide.  Dr. Dyson may testify regarding products into which asbestos sold by Union Carbide was incorporated and the ability, or lack thereof, of such products to release respirable asbestos fibers under various occupational conditions.

Dr. Dyson may be provided with copies of the testing data of experts retained by counsel for Plaintiff and may be asked to comment on the methods used in the studies as well as the results of the studies, as compared to published studies and data reviewed by Dr. Dyson.

6.  ALLEN GIBBS, M.D.
Llandough Hospital
Penarth, Glamorgan CF64 2XX
United Kingdom

Dr. Gibbs is a pulmonary pathologist.  Dr. Gibbs may testify as to the general medical aspects of the diagnosis and treatment of asbestos-related disease and the pathological effects of asbestos on the lung.  He may also testify as to the relationship of asbestos exposure and the incidence of conditions alleged by Plaintiff, including pleural plaques, asbestosis, lung cancer and mesothelioma.  Dr. Gibbs may testify that "asbestos" is a generic term for a group of naturally occurring fibrous minerals.  Dr. Gibbs may testify

that there are two major groups of asbestos – serpentine and amphiboles – which have different physical forms and clearance rates after deposition in human lungs. Dr. Gibbs may testify that the serpentine group contains one form of asbestos – chrysotile – and that the amphibole group contains several forms of asbestos – including crocidolite, amosite, tremolite, actinolite, and anthophylite. Dr. Gibbs may testify regarding the differing potential of these various forms of asbestos to cause conditions alleged by Plaintiff, including pleural plaques, asbestosis, lung cancer and mesothelioma. Dr. Gibbs may testify generally regarding the role that the size, structure and chemical composition of different types of asbestos fibers plays in their ability, or lack thereof, to cause conditions alleged by Plaintiff. Dr. Gibbs may testify generally regarding the role of dose in determining whether certain types of asbestos fibers can cause or contribute to conditions alleged by Plaintiff. Dr. Gibbs may testify generally regarding the latency periods associated with asbestos-related conditions alleged by Plaintiff. Dr. Gibbs may testify regarding the evidence that tremolite contamination (or other exposure to amphibole asbestos) explains the incidence of certain asbestos-related disease among individuals exposed to chrysotile asbestos.

Dr. Gibbs may also testify regarding "Calidria" asbestos, the type of asbestos mined and sold by Union Carbide. Dr. Gibbs may testify that Calidria is a unique form of short fiber chrysotile asbestos that is tremolite-free. Dr. Gibbs may testify that, because of its unique properties, Calidria could not have caused or contributed to the conditions alleged by Plaintiff.

Dr. Gibbs may also testify regarding the diagnosis of any purportedly asbestos-related disease or condition alleged by Plaintiff and respond to testimony by any of Plaintiff's experts regarding the same. Dr. Gibbs may also testify regarding other probable or possible causes of any disease or condition alleged by Plaintiff, including but not limited to, smoking where relevant.

Dr. Gibbs is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

7. PHILIP GOODMAN, M.D.
   Duke University Medical Center
   Department of Radiology
   Room 1519B Duke North
   Durham, North Carolina 27710

Dr. Goodman is a Professor of Radiology and the Associate Dean for Medical Education at Duke University Medical Center. He is board-certified in Radiology and received his B-Reader certification in 1975. He received his Bachelor of Science degree and medical degree from the University of California, Los Angeles. He completed his residency in radiology at University of California, Irvine and University of California, San Francisco. Dr. Goodman has taught various courses at University of California, San

Francisco and Duke University Medical Center, including pathophysiology of disease, pathology, and thoracic imaging. Currently, he is a reviewer for Chest, Radiology, American Review of Respiratory and Critical Care Medicine, and American Journal of Medicine. Dr. Goodman is a founding member of the Society of Thoracic Radiologists and currently a member of the Radiology Society of North America.

Dr. Goodman is an expert in radiology, the interpretation of x-rays, CT scans and radiographic abnormalities consistent with the diagnosis of lung diseases, including but not limited to asbestosis, interstitial lung disease, asbestos-related pleural changes, lung cancer, mesothelioma, COPD and emphysema. Dr. Goodman is expected to testify about the radiological assessment of Plaintiff's alleged exposure to asbestos. He may testify regarding his review of chest x-rays and his B-reading of the same.

Dr. Goodman is also expected to provide testimony with respect to radiology as a diagnostic aid in asbestos-related diseases and other lung diseases. Dr. Goodman may render opinions based on his review of the Plaintiff's chest x-rays, CT scans and other radiographic findings.

Dr. Goodman may be asked to respond to the testimony and documents of certain witnesses offered at the time of trial or in deposition, including, but not limited to, testimony of witnesses offered by the Plaintiff.

8.  MICHAEL ALAN GRAHAM, M.D.
    Division of Forensic and Environmental Pathology
    St. Louis University School of Medicine
    3556 Caroline Street
    St. Louis, Missouri 63104

Dr. Graham is a pathologist. Dr. Graham may testify as to the general medical aspects of the diagnosis and treatment of asbestos-related disease and the pathological effects of asbestos on the lung. He may also testify as to the relationship of asbestos exposure and the incidence of conditions alleged by Plaintiff, including pleural plaques, asbestosis, lung cancer and mesothelioma. Dr. Graham may testify that "asbestos" is a generic term for a group of naturally occurring fibrous minerals. Dr. Graham may testify that there are two major groups of asbestos – serpentine and amphiboles – which have different physical forms and clearance rates after deposition in human lungs. Dr. Graham may testify that the serpentine group contains one form of asbestos – chrysotile – and that the amphibole group contains several forms of asbestos – including crocidolite, amosite, tremolite, actinolite, and anthophylite. Dr. Graham may testify regarding the differing potential of these various forms of asbestos, including Calidria asbestos, to cause conditions alleged by Plaintiff, including pleural plaques, asbestosis, lung cancer and mesothelioma. Dr. Graham may testify generally regarding the role that the size, structure and chemical composition of different types of asbestos fibers plays in their ability, or lack thereof, to cause conditions alleged by Plaintiff. Dr. Graham may testify generally regarding the role of dose in determining whether certain types of asbestos fibers can cause or contribute to conditions alleged by Plaintiff. Dr. Graham may testify generally

regarding the latency periods associated with asbestos-related conditions alleged by Plaintiff. Dr. Graham may testify regarding the evidence that tremolite contamination (or other exposure to amphibole asbestos) explains the incidence of certain asbestos-related disease among individuals exposed to chrysotile asbestos.

Dr. Graham may also testify regarding the diagnosis of any purportedly asbestos-related disease or condition alleged by Plaintiff and respond to testimony by any of Plaintiff's experts regarding the same. Dr. Graham may also testify regarding other probable or possible causes of any disease or condition alleged by Plaintiff, including but not limited to, smoking where relevant.

Dr. Graham is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

9.  ALIYA N. HUSAIN, MD
    Department of Pathology
    University of Chicago Hospitals
    5841 South Maryland, MC 6101
    Chicago, IL 60637

Dr. Husain is a board-certified pathologist specializing in pediatric pathology and the diagnosis of diseases and conditions of the lungs and heart. Dr. Husain received her medical degree from King Edward Medical College in Lahore Pakistan in 1980. Dr. Husain is currently a Professor of Pathology at the University of Chicago Medical Center.

Dr. Husain's professional memberships include the U.S. and Canadian Academy of Pathology and the Pulmonary Pathology Society. Dr. Husain has co-authored numerous peer reviewed articles and other non-peer reviewed articles, book chapters, letters to the editor, abstracts and books. Dr. Husain's qualifications are set forth in greater detail in her curriculum vitae, which will be furnished upon request.

Dr. Husain is expected to testify generally regarding the scientific and medical methods and criteria available for evaluating pathology and making a pathological diagnosis of mesothelioma and other asbestos-related diseases and conditions, as well as the strengths and limitations of such scientific and medical methods. Dr. Husain is expected to testify regarding the pathologic diagnosis of any purported asbestos-related disease or condition alleged by the Plaintiff and is expected to respond to testimony by any of Plaintiff's experts regarding same. Dr. Husain may be asked to respond to the testimony of certain witnesses offered at the time of trial or in deposition.

Dr. Husain is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

Dr. Husain's opinions are based on her training, experience, education, and research publications, as well as her review of Plaintiff's pathological materials, medical records, transcripts of depositions in the case, parties' responses to written discovery requests and her review of the peer reviewed medical and scientific literature. Dr. Husain is expected to rely on opinions and records of other experts involved in asbestos litigation.

10. DR. JOHN MOALLI
     Exponent, Inc.
     149 Commonwealth Dr.
     Menlo Park, CA 94025

Dr. Moalli is an expert in material science and polymer science. He will testify about the phenolic molding compound products and product lines manufacture by Union Carbide, including, but not limited to, their compositions, formulas, specifications, manufacture, asbestos content, uses, lifespans, natures and properties. He will also testify about the processes for manufacturing finished products from phenolic molding compounds, such as the phenolic molding compounds sold by Union Carbide, as well as the physical and chemical properties and characteristics of such products. Dr. Moalli will testify regarding the manufacture of molded products from remade Union Carbide asbestos-containing phenolic molding compounds at the R.J. Lee Group facilities.

Dr. Moalli may also testify generally about "Bakelite" products and what products are considered "Bakelite" in industry as well as the specific fields of material science and polymer science. Dr. Moalli may also testify about the type of phenolic resin products identified by Plaintiff's witnesses and whether such products were manufactured from Union Carbide's asbestos-containing phenolic molding compound.

Dr. Moalli may comment on and/or respond to expert testimony or opinion offered on behalf of Plaintiff. He may also testify concerning any testing done by or on behalf of Plaintiff, including, but not limited to, testing on products purporting to be manufactured from phenolic molding compounds. In particular, he may testify regarding the results of tests and analyses conducted by Analyze, Inc. on material purporting to be manufactured from Bakelite phenolic molding compound. He will testify that this material was not made from phenolic molding compound.

11. SURESH H. MOOLGAVKAR, M.D., Ph.D.
     15375 SE 30th Place
     Suite 250
     Bellevue, WA 98007

Dr. Moolgavkar is a physician with a Ph.D. in mathematics and post-doctoral training in Epidemiology and Biostatistics. He is currently a Corporate Vice President and Director of the Center for Epidemiology, Biostatistics, and Computational Biology at Exponent, Inc., an international consulting company. Since 1984 he has been a Full Member of the Fred Hutchinson Cancer Research Center, as well as Professor of Epidemiology and Adjunct Professor of Biostatistics at the University of Washington in

Seattle.  He has served on the faculties of the Johns Hopkins University, Indiana University, the Fox Chase Cancer Center, and the University of Pennsylvania.  He has been a visiting scientist at the Radiation Effect Research Foundation in Hiroshima, the International Agency for Research on Cancer in Lyon, and the German Cancer Research Center in Heidelberg.

Dr. Moolgavkar has served on numerous review panels and as a consultant to agencies including the National Cancer Institute, the Environmental Protection Agency, the Canadian Department of Health and Welfare, the International Agency for Research on Cancer, and the Chemical Industry Institute of Toxicology.  He is also the author or co-author of more than 160 papers in the areas of epidemiology, biostatistics, and quantitative risk assessment and has edited three books in these areas.  Dr. Moolgavkar has served on the editorial board of Genetic Epidemiology, Risk Analysis – An International Journal and serves on the editorial board of Inhalation Toxicology.  Additionally, Dr. Moolgavkar is an elected member of the American Epidemiological Society.  His qualifications are set forth in greater detail in his curriculum vitae, which will be furnished upon request.

Dr. Moolgavkar will testify about the basic principles of epidemiology, the fundamental principles of carcinogenesis and the impact of environmental agents, and the potency of chrysotile asbestos and amphibole asbestos to increase the risk of asbestos-related disease, including lung cancer and pleural mesothelioma.  He may further testify regarding the relationship of asbestos exposure and the incidence of conditions alleged by Plaintiff and the differing potential of these various forms of asbestos, including Calidria asbestos, to increase the risk of the development of the conditions alleged by Plaintiff.

Dr. Moolgavkar may testify as the strengths and weaknesses of analytical and descriptive epidemiological studies.  He may opine that in general, to establish causality, certain other criteria referred to as the Hill criteria are considered (in addition to the finding of an association).  He may testify that if repeated analytic studies find no evidence of an association between the exposure and the disease, it is safe to conclude that the exposure does not increase the risk of the disease.

Dr. Moolgavkar may offer testimony on the fundamental principles of carcinogenesis and the impact of environmental agents, such as asbestos, on the carcinogenic process.  Dr. Moolgavkar may testify that not all lung cancers and mesotheliomas are asbestos-related.  He may testify that a large fraction of peritoneal mesotheliomas in the United States in males and females are not asbestos-related.  Dr. Moolgavkar may also discuss the literature concerning background rates of mesothelioma and mesothelioma rates.  Specifically, Dr. Moolgavkar may discuss his findings detailed in Moolgavkar, SH, et al., "Pleural and Peritoneal Mesotheliomas in SEER: Age Effects and Temporal Trends, 1973-2005," Cancer Causes Control, 20:935-944 (2009).  He may also discuss the literature and data supporting non-asbestos related mesotheliomas, including spontaneous mesotheliomas.

Dr. Moolgavkar may testify that "asbestos" is a generic term for a group of naturally occurring fibrous minerals. Dr. Moolgavkar may testify that there are two major groups of

asbestos – serpentine and amphiboles – which have different physical forms and clearance rates after deposition in human lungs. Dr. Moolgavkar may testify that the serpentine group contains one form of asbestos – chrysotile – and that the amphibole group contains several forms of asbestos – including crocidolite, amosite, tremolite, actinolite, and anthophylite. Dr. Moolgavkar may testify regarding the evidence that tremolite contamination (or other exposure to amphibole asbestos) explains the incidence of certain asbestos-related disease among individuals exposed to chrysotile asbestos.  Dr. Moolgavkar may further testify about Calidria and its unique properties.  He may also testify about the potency of chrysotile asbestos and amphibole asbestos to increase the risk of asbestos-related disease. Specifically, he may opine that amphibole asbestos is far more potent that chrysotile and most asbestos-related diseases are related to exposure to amphibole asbestos.

Dr. Moolgavkar also may testify as to the relationship of asbestos exposure and the incidence of conditions alleged by Plaintiff. Dr. Moolgavkar may testify regarding the differing potential of these various forms of asbestos, including Calidria asbestos, to increase the risk of the conditions alleged by Plaintiff. Dr. Moolgavkar may testify generally regarding the role that the size, structure and chemical composition of different types of asbestos fibers plays in their ability, or lack thereof, to increase the risk of the conditions alleged by Plaintiff. Dr. Moolgavkar may testify generally regarding the role of dose in determining whether certain types of asbestos fibers can increase the risk of the development of the conditions alleged by Plaintiff.  Dr. Moolgavkar may also testify generally regarding the latency periods associated with asbestos-related conditions alleged by Plaintiff.

Dr. Moolgavkar's testimony will be based on his training, experience, education, and publications; his review of the medical, governmental and scientific literature; his review of medical records; his review of Plaintiff's and/or co-worker testimony; and any other materials provided to him for his review in this case.

12. DENNIS PAUSTENBACH, PH.D.
    Paustenbach and Associates
    970 West Broadway
    Suite E
    Jackson, WY  83001

Dr. Paustenbach is a certified industrial hygienist and toxicologist.  Dr. Paustenbach may testify about industrial hygiene and Threshold Limit Values ("TLV's"), OSHA PEL's, exposure limits, methodologies for identifying and measuring asbestos in air, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques.  Dr. Paustenbach may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos release and exposure.  Dr. Paustenbach may also testify about the dose-response relationship between exposure to asbestos and disease, and other related matters.

Dr. Paustenbach is expected to testify about the principles of industrial hygiene and the factors that are important to industrial hygiene studies.  He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases.  Dr. Paustenbach is expected to testify as to the manner in which industrial hygiene data should be considered in evaluating exposures.

Dr. Paustenbach will testify regarding the source, amount, and type of asbestos fibers to which Plaintiff may have been exposed based on review of available workplace documents, His employment records, co-worker testimony, industrial hygiene surveys of work sites and literature and studies describing exposures associated with different work practices, and/or hypothetical facts presented at the time of trial.

Dr. Paustenbach is expected to testify as to the ability of various types of fibers to cause disease and the properties of fibers that are believed to be necessary in order to cause disease. Dr. Paustenbach is expected to testify that the literature, including epidemiological data, does not support a causal relationship between exposure to low levels of chrysotile asbestos, and the development of asbestos-related diseases.  Dr. Paustenbach is also expected to testify that such levels would not be a contributing factor along with other exposures in causing disease.

Dr. Paustenbach is expected to testify that Melvin H. Francis's environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided more likely than not increased his risk of developing alleged asbestos-related disease.

Dr. Paustenbach may comment on and/or respond to expert testimony or opinion offered on behalf of Plaintiff, including, but not limited, to testimony (if any) regarding the evolution of knowledge of the effects of asbestos exposure, and standards and regulations applicable to asbestos exposure.  He may also testify regarding any testing done by or on behalf of Plaintiff, including, but not limited to, test methodologies and analytical methods. Dr. Paustenbach may also comment upon or analyze asbestos exposures relating to or described by Plaintiff and/or any co-workers in this case.

13. CHARLES REDINGER, PHD.
       Redinger 360
       6 Lancaster County Road, Suite 3
       Harvard, Massachusetts 01451

Dr. Redinger is an industrial hygienist. Dr. Redinger may testify about industrial hygiene and threshold limit values, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques.

Dr. Redinger may also testify concerning the sale by this Defendant of asbestos and the uses of asbestos sold by this Defendant. Dr. Redinger may testify regarding products into which asbestos sold by this Defendant was incorporated and the ability, or lack thereof,

of such products to release respirable asbestos fibers under various occupational conditions.

Dr. Redinger may also testify regarding industrial hygiene conditions at this Defendant's facilities to the extent that Plaintiff allege Plaintiff was exposed to asbestos at such locations. Dr. Redinger may testify regarding the level of asbestos dust and the types of asbestos fibers that Plaintiff may have been exposed to based on review of available work place documents, employment records and testimony, co-worker testimony, industrial hygiene surveys of work sites, and/or hypothetical facts presented at the time of trial.

14. GAIL D. STOCKMAN, M.D.
    3401 Greathouse Road
    Waxahachie, Texas 75167

Dr. Stockman received her medical degree in 1976 and her Ph.D. in immunology in 1971 from Baylor College of Medicine. She is Board certified in internal medicine and has thirty-eight years of experience in pulmonary, internal, and critical care medicine. She most recently practiced at Navarro Regional Medical Center in Corsicana, Texas. Dr. Stockman served as the Medical Director of Case Management at Kalispell Regional Medical Center from September 2011 to July 2012 and Chief of Medicine at Longview Regional Medical Center and Good Shepherd Medical Center in 1984 and from 1991 to 1992, respectively.

Dr. Stockman may testify regarding the diagnosis of any purportedly asbestos-related disease or condition alleged by Plaintiff and respond to testimony by any of Plaintiff's experts regarding the same. In addition to case materials and documents related to Plaintiff's work history and alleged exposures to asbestos, Dr. Stockman has reviewed Plaintiff's medical records and other available materials, including chest films, x-rays, PET scans, and CT scans. Based on that review, Dr. Stockman is prepared to testify regarding her findings. Dr. Stockman may also testify regarding other probable or possible causes of any disease or condition alleged by Plaintiff, including, but not limited to, smoking, where relevant.

Dr. Stockman may testify concerning the health effects of asbestos exposure during the relevant time periods of Plaintiff's employment. She may also provide an analysis of Plaintiff's work environment, work history, and occupational history, including, but not limited to, a discussion of the significance, intensity, and disease-causing potential arising from exposure at various places of employment.

Dr. Stockman may testify concerning state of the scientific and medical art regarding the history and knowledge of asbestos and asbestos-related diseases, and general medicine regarding asbestos exposure. Dr. Stockman may testify concerning state of the scientific and medical art regarding the history and knowledge of asbestos and asbestos-related diseases generally and specifically as it relates to mesothelioma and lung cancer. Dr. Stockman may also testify regarding governmental regulations and policies applicable

to asbestos exposure and health risks, and the state-of-the-art of such knowledge and policies at pertinent times.  Dr. Stockman may discuss the epidemiology of asbestos-related diseases and provide an analysis of Plaintiff's exposure to asbestos and other potential agents.

Dr. Stockman is expected to testify that Melvin H. Francis's alleged asbestos-related disease was more likely than not due to his environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided.

Dr. Stockman may be asked to respond to the testimony and documents of certain witnesses offered at the time of trial or in deposition, including, but not limited to, the testimony of witnesses offered by the Plaintiff.

15. SAUL SUSTER, M.D.
Department of Pathology & Laboratory Medicine
The Medical College of Wisconsin
Dynacare Lab. Bldg., Room 226
9200 West Wisconsin Avenue
Milwaukee, WI 53226

Dr. Suster is Professor and Chairman Emeritus of the Department of Pathology and Laboratory Medicine at The Medical College of Wisconsin.  He previously served as Chairman from 2007 until 2018.  Dr. Shuster came to The Medical College of Wisconsin in 2007 after having served as Vice Chairman and Director of Anatomic Pathology Services at the Department of Pathology, The Ohio State University Hospital and The Arthur G. James Cancer and Solove Research Institute in Columbus, Ohio from 1998 until 2007.  Dr. Suster's qualifications are set forth in greater detail in his curriculum vitae, which will be furnished upon request.

Dr. Suster is expected to testify generally regarding the scientific and medical methods and criteria available for evaluating pathology and making a pathological diagnosis of mesothelioma and other lung diseases and conditions.  Dr. Suster is expected to testify regarding the pathologic diagnosis of any purported asbestos-related disease or condition alleged by the Plaintiff and is expected to respond to testimony by any of Plaintiff's experts regarding same.  Dr. Suster may be asked to respond to the testimony of certain witnesses offered at the time of trial or in deposition.

Dr. Suster's opinions are based on his training, experience, education, and research publications, as well as his review of Plaintiff's pathological materials, medical records, transcripts of depositions in the case, parties' responses to written discovery requests and his review of the peer reviewed medical and scientific literature.

16. DREW VAN ORDEN
R.J. Lee Group, Inc.
350 Hochberg Road
Monroeville, Pennsylvania 15146

Mr. Van Orden is mineral engineer and a statistician.  Mr. Van Orden may be called to testify about the development and use of scientific knowledge and techniques regarding the collection, analysis and measurement of airborne asbestos levels. He may also testify as to the governmental and industrial standards, past and present, for airborne asbestos. Additionally, he may be called to testify about the development and use of the technology to measure airborne levels of fibers, and the standards and methods used for air sampling and sample preparation, including the direct and indirect methods.  Mr. Van Orden may also testify about standards governing asbestos and the methodologies for sampling, measuring and analyzing air to determine the presence of particles, and the history and current methodologies for electron microscopy.  Mr. Van Orden will testify regarding the results of certain studies performed at his laboratory on products molded from remade Union Carbide asbestos-containing molding compounds.

Mr. Van Orden will testify based on these studies that, for the types of activities tested, he would not expect any substantial release of asbestos fibers from the products tested.  He may also comment on and/or respond to expert testimony or opinion offered on behalf of Plaintiff, including, but not limited to, testimony and/or reports (if any) regarding testing relating to potential asbestos exposure done by or on behalf of Plaintiff, test methodologies, and analytical methods.

17. TONY WATSON, MSPH, CIH, CSP
Workplace Hygiene, Inc.
420-B Gallimore Dairy Road
Greensboro, NC 27409

Mr. Watson is a certified industrial hygienist.  Mr. Watson may testify about industrial hygiene and threshold limit values, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques.  Mr. Watson may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos release and exposure.  Mr. Watson may also testify about the development of knowledge regarding the dose-response relationship between exposure to asbestos and disease, and other related matters.

Mr. Watson is expected to testify about the principles of industrial hygiene and the factors that are important to industrial hygiene studies.  He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases.  Mr. Watson is expected to testify as to the manner in which industrial hygiene data should be considered in evaluating exposures.

Mr. Watson may testify regarding the level of asbestos dust and the types of asbestos fibers that Plaintiff may have been exposed based on review of available work

place documents, employment records and testimony, co-worker testimony, industrial hygiene surveys of work sites, and/or hypothetical facts presented at the time of trial.

Mr. Watson may also testify concerning the sale by Union Carbide of asbestos and the uses of asbestos sold by Union Carbide. Mr. Watson may testify regarding products into which asbestos sold by Union Carbide was incorporated and the ability, or lack thereof, of such products to release respirable asbestos fibers under various occupational conditions.

Mr. Watson is expected to testify that Melvin H. Francis's environmental exposures to asbestos from Johns Manville asbestos scrap distributed throughout the Westbank of Orleans and Jefferson Parishes where Mr. Francis resided more likely than not increased his risk of developing alleged asbestos-related disease.

Mr. Watson may be provided with copies of the testing data of experts retained by counsel for Plaintiff and may be asked to comment on the methods used in the studies as well as the results of the studies, as compared to published studies and data reviewed by Mr. Watson.

18. OTTO WONG, Sc.D., F.A.C.E.
    Applied Health Science, Inc.
    181 Second Avenue
    Suite 628
    San Mateo, CA 94401

Dr. Wong is a board-certified epidemiologist and a fellow of the American College of Epidemiology. He is expected to testify regarding the history and development of scientific and medical knowledge about asbestos-related disease, the epidemiology of asbestos diseases, and increased risk of cancer and life-shortening problems not related to asbestos exposure. He is also expected to testify as to the status of epidemiological studies regarding asbestos-related diseases.

Union Carbide reserves the right to call all treating physicians identified by Plaintiff during deposition testimony and in discovery responses, as well as any physicians associated with any hospital, medical facility and/or provider identified during and throughout the discovery process. Union Carbide further reserves the right to call any and all physicians identified or referred to in any of the Plaintiff's medical records and/or any and all expert witnesses retained by other parties.

III.   **FACT WITNESSES**

The following may be called live or by transcript:

1. Plaintiff Melvin H. Francis (deceased, via deposition);

2. Plaintiffs;

3. Any and all co-workers and product identification witnesses identified during the course of discovery;

4. Any witness who will offer rebuttal testimony to Plaintiffs' or Cross-Claim Plaintiff's fact and/or expert witnesses;

5. Representatives of Melvin H. Francis's employers regarding his work activities, wages, and products supplied to his work sites;

6. Representatives, employers and/or employees of Contractors and/or Subcontractors who worked at same jobsite during time Melvin H. Francis worked at said jobsite who may possess knowledge about all asbestos-containing products at jobsite(s) identified.

7. Any witnesses, live or by transcript, listed or withdrawn by any party, not subject to objection by this Defendant;

8. Any witness, live, by transcript, or other sworn testimony (including affidavits) necessary for the authentication of exhibits / documents as to which Plaintiffs and Cross-Claim Plaintiffs may raise an objection to at trial;

9. Any witness, live or by transcript, offered in response to a 30(b)(6) or 1442 deposition noticed by any party not subject to objection by this Defendant;

10. Any individual identified on any exhibit submitted by this Defendant in this case;

11. A witness or corporate designee of any entity that Plaintiffs or Cross-Claim Plaintiffs allege that may have manufactured, distributed or otherwise exposed Melvin H. Francis to any asbestos or asbestos-containing product at any time;

12. A witness or corporate designee of any entity that supplied raw asbestos fiber to a manufacturer of an asbestos-containing product to which Plaintiffs and Cross-Claim Plaintiffs allege exposure;

13. Representatives and records custodian(s) of any bankrupt entity to which Plaintiff submitted a proof of claim form as a result of asbestos exposure, including but not limited to Celotex, Philip Carey, Johns Manville, and any other asbestos-trust.

14. Debra Bendily
    2205 Lee Drive
    Baton Rouge, LA 70808

    Debra Bendily is a former employee with the Department of Environmental Quality who has extensive personal knowledge regarding the Johns-Manville asbestos scrap that was widely distributed throughout the Orleans and Jefferson Parish areas, including what is referred to as the West Bank.  Ms. Bendily may testify live or via deposition testimony;

15. Claude Hampton, deceased, via trial testimony in *Joseph Di Marco v. Johns-Manville Corporation, et al,* USDC-EDLA, No. 83-5737, Volume IV, February 15, 1985;

16. Olide Klibert, deceased, via trial testimony in *Joseph Di Marco v. Johns-Manville Corporation, et al,* USDC-EDLA, No. 83-5737, Volume V, February 15, 1985;

17. Kemener Whalen, deceased, via deposition testimony, Volumes I, II, and III taken in the *Bailey v. Johns-Manville, et al.*;

18. Custodian of Records of Louisiana DEQ and EPA regarding the Johns-Manville Westbank Asbestos Site documents;

19. Any witness who has knowledge regarding the distribution and use of Johns-Manville asbestos scrap for various purposes, including but not limited to driveways, sidewalks, streets, etc. on the West Bank;

20. William C. Lehnert (by prior testimony)

    Mr. Lehnert is the former Manager of Product Development and Technical Services of the Gypsum Division of Georgia-Pacific Corporation. Mr. Lehnert has historical knowledge of, and will testify regarding, Georgia-Pacific's experience with and use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Georgia-Pacific's asbestos-containing products; Georgia-Pacific's knowledge of the potential hazards associated with the use of asbestos; the warnings provided by Georgia-Pacific to its customers regarding such potential hazards; and the relationship between Union Carbide and Georgia Pacific Corporation.

21. Eugene Burch (by prior testimony)

    Mr. Burch is a former employee of Georgia Pacific Corporation. Mr. Burch has historical knowledge of, and will testify regarding, Georgia-Pacific's experience with and use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Georgia-Pacific's asbestos-containing products; Georgia-Pacific's knowledge of the potential hazards associated with the use of asbestos; the warnings provided by Georgia-Pacific to its customers regarding such potential

hazards; and the relationship between Union Carbide and Georgia Pacific Corporation.

22. Howard Schutte (live or by prior testimony)

Mr. Schutte has historical knowledge of, and will testify regarding, Georgia-Pacific's experience with and use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Georgia-Pacific's asbestos-containing products; Georgia-Pacific's knowledge of the potential hazards associated with the use of asbestos; the warnings provided by Georgia-Pacific to its customers regarding such potential hazards; and the relationship between Union Carbide and Georgia Pacific Corporation.

23. Ann Ksionyzk (live or by prior testimony)

Ms. Ksionyzk will testify regarding Georgia-Pacific Corporation's experience with and use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Georgia-Pacific's asbestos-containing products; Georgia-Pacific's knowledge of the potential hazards associated with the use of asbestos; the warnings provided by Georgia-Pacific to its customers regarding such potential hazards; and the relationship between Union Carbide and Georgia Pacific Corporation.

24. George Kirk (by prior testimony)

Mr. Kirk will testify regarding Kaiser Gypsum Corporation's asbestos-containing products and the relationship between Union Carbide and Kaiser Gypsum Corporation. He has historical knowledge of Kaiser Gypsum's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Kaiser Gypsum's asbestos-containing products; Kaiser Gypsum's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by Kaiser Gypsum to its customers regarding such potential hazards.

25. Amy Yi (live or by prior testimony)

Ms. Yi will testify regarding Kaiser Gypsum Corporation's asbestos-containing products and the relationship between Union Carbide and Kaiser Gypsum Corporation. She has historical knowledge of Kaiser Gypsum's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Kaiser Gypsum's asbestos-containing products; Kaiser Gypsum's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by Kaiser Gypsum to its customers regarding such potential hazards.

26. Howard Bowman (live or by prior testimony)

Mr. Bowman will testify regarding United States Gypsum Company's asbestos-containing products and the relationship between Union Carbide and United States Gypsum.  He has historical knowledge of United States Gypsum's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of United States Gypsum's asbestos-containing products; United States Gypsum's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by United States Gypsum to its customers regarding such potential hazards.

27. Douglas W. Merrill (by prior testimony)

Mr. Merrill is the Director of Manufacturing for Kelly Moore Paint Company, Inc. He has historical knowledge, and will testify regarding, Kelly Moore's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of Kelly Moore's asbestos-containing products; Kelly Moore's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by Kelly Moore to its customers regarding such potential hazards.

28. Russell Ward (by prior testimony)

Mr. Ward will testify regarding National Gypsum Corporation's asbestos-containing products and the relationship between Union Carbide and National Gypsum Corporation.  He has historical knowledge of National Gypsum's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of National Gypsum's asbestos-containing products; National Gypsum's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by National Gypsum to its customers regarding such potential hazards.

29. Frank Zimmerman (by prior testimony)

Mr. Zimmerman will testify regarding National Gypsum Corporation's asbestos-containing products and the relationship between Union Carbide and National Gypsum Corporation.  He has historical knowledge of National Gypsum's use of asbestos in manufacturing; the sale, manufacture, distribution and labeling of National Gypsum's asbestos-containing products; National Gypsum's knowledge of the potential hazards associated with the use of asbestos; and the warnings provided by National Gypsum to its customers regarding such potential hazards.

**B.**     <u>Specific Union Carbide Fact Witnesses</u>

1. Sarah Opperman (live or by prior testimony)
   c/o Laurie Strauch Weiss or Morty Dubin
   Orrick, Herrington & Sutcliffe, LLP
   666 5th Avenue
   New York, New York 10103

   Ms. Opperman was employed by The Dow Chemical Company from 1980 to 2009. Ms. Opperman has reviewed historical Union Carbide documents and testimony of former Union Carbide employees regarding the operation of the Calidria business. Ms. Opperman may testify about Union Carbide Corporation's Calidria business, including, but not limited to, the following topics: : the discovery, research and development, mining and milling, and sales of Calidria; the physical and other properties of Calidria, its potential uses and applications, and how it compares to other types of asbestos; the practice and philosophy of Union Carbide in communicating health and safety information to customers and employees, including the types of health and safety information that Union Carbide provided; the types of customers who purchased Union Carbide's Calidria and their experience and use of asbestos in their manufacturing processes; the discovery, research and development, mining and milling, and sale of Calidria asbestos; the medical surveillance program at King City, as well as the practice of Union Carbide of sharing health and safety information with employees at King City; and the performance of the Calidria asbestos business.

2. John L. Myers (by prior testimony)

   Mr. Myers held several positions while employed by Union Carbide from 1951 to 1985, including Technical Superintendent at the King City mill, Marketing Manager for Calidria, and Product and Production Manager for Calidria. Mr. Myers became President of KCAC, the company that purchased from Union Carbide the Calidria business in 1985, and held that position until his retirement in 1993. Mr. Myers may testify about his approximately 27 years of experience with Calidria asbestos, including, but not limited to, the following topics: the discovery, research and development, mining and milling, and sales of Calidria; the medical surveillance program at King City; the unique physical and other properties of Calidria, it's potential use and applications, and how it compares to other types of asbestos; the practice of Union Carbide of sharing health and safety information with customers and employees at King City, including the various ways that Union Carbide communicated health and safety information; the types of customers that purchased Calidria from Union Carbide and their level of experience working with asbestos and awareness of health and safety issues; and the performance of the asbestos business.

3. John Edward "Jack" Walsh (by prior testimony)

Mr. Walsh held several positions while employed by Union Carbide from 1961 to 1985, including as a technical sales representative from 1972 to 1985 for the Calidria asbestos group, with responsibility for the Southeastern and Southwestern parts of the United States. Mr. Walsh may testify about his many years of experience working with Calidria asbestos, including, but not limited to, the following topics: the unique physical and performance aspects of Calidria; the potential and actual uses for Calidria; the practice and philosophy of Union Carbide in communicating health and safety information to customers and employees, including the types of health and safety information that Union Carbide provided; the nature of the dealings that Mr. Walsh had with the customers that he had contact with; the tape joint compound industry, including the tape joint compound manufacturers' experience using asbestos; the discovery, research and development, mining and milling, and sale of Calidria asbestos; the medical surveillance program at King City, as well as the practice of Union Carbide of sharing health and safety information with employees at King City; the unique physical and other properties of Calidria, its potential use sand applications, and how it compares to other types of asbestos; and the performance of the Calidria asbestos business.

4. Thomas J. Hall, Ph.D. (by prior testimony)

Dr. Hall is a former employee of Union Carbide Corporation. Dr. Hall may testify regarding the Calidria asbestos business generally, including, but not limited to, the type of asbestos mined and milled, the unique aspects of Calidria asbestos and its use, the sales and marketing practices of Calidria, the knowledge of the hazards associated with different types of asbestos and the communication of those potential hazards to customers, including the various methods and documents used to communicate health and safety issues to customers. Mr. Hall may also testify about the market conditions and his experience with sales of Union Carbide's asbestos in Europe in the mid and late 1960s; the circumstances and details surrounding the drafting of the May 5, 1967 "Asbestos as a Health Hazard in the United Kingdom" by Ian Sayers; and Union Carbide's reaction to that report, along with any other issues that might be relevant to the Plaintiff's case including but not limited to, rebuttal testimony.

5. Ian Sayers (by prior testimony)

Mr. Sayers is a former salesman of a Union Carbide European subsidiary, and was involved with the attempted sales of asbestos in Europe in the mid to late 1960s. Mr. Sayers is the author of a May 12, 1967 report entitled "Asbestos as a Health Hazard in the United Kingdom" (the "Sayers Report"). Mr. Sayers may testify regarding the market conditions and his experience with sales of Union Carbide's asbestos in Europe in the mid and late 1960s; including, but not limited

to, the circumstances and details surrounding his drafting of the Sayers Report; and Union Carbide's reaction to the Sayers Report.

6. Duane Hyde, M.D. (by prior testimony)

Dr. Hyde is a physician who has examined and treated workers at Union Carbide's Calidria mines and mills and can testify as to the absence of medical disease in such workers at these locations. He will provide a medical explanation for such lack of disease.

7. Darrell Garcia (by prior testimony)

Mr. Garcia is a former employee of Union Carbide. He began working as a laborer at Union Carbide's King City asbestos mill (the "Mill") in 1963 and held several positions there before becoming safety supervisor in 1984. Mr. Garcia continued to work at the Mill after it was acquired by KCAC in 1985 and remained there until 2003. Mr. Garcia will testify about Union Carbide generally, the safety program at the Mill during the years it was owned by Union Carbide, and the manner in which Union Carbide communicated health and safety information to customers visiting the Mill and individuals who worked there.

8. Dr. Carl U. Dernehl, M.D. (by prior testimony)

Dr. Dernehl began working for Union Carbide in 1947 as the medical director of Union Carbide's Texas City chemical plant.  In 1955, Dr. Dernehl became an assistant medical director for Union Carbide's chemical plants, and in 1963 he became Union Carbide's director of toxicology.  Dr. Dernehl served as associate corporate medical director of Union Carbide from 1965 until his retirement in 1979. During that period, Dr. Dernehl's responsibilities included oversight for toxicology and industrial hygiene for Union Carbide's entire operation.  Dr. Dernehl may testify regarding Union Carbide's historical knowledge regarding the various health risks associated with different types of asbestos, as well as Union Carbide documents regarding the various health risks associated with different types of asbestos.

9. Mr. Carlo Martino, Retired (by prior testimony)

Mr. Martino, worked in the Chemical and Plastics Division of Union Carbide at the Bound Brook, New Jersey Facility. Mr. Martino provided research and development and technical product support for the Union Carbide phenolic molding compounds from approximately 1959 until the mid-1970s. Union Carbide may rely on prior testimony by Mr. Martino about various phenolic molding compound products and product lines manufactured by Union Carbide, including, but not limited to, their development, composition, formulas, specifications, manufacture, asbestos content, uses, lifespan, and nature and properties.  Union Carbide may further rely on Mr. Martino's prior testimony regarding the customers to whom

phenolic molding compounds were sold, including the products being manufactured by these customers. Union Carbide may also rely on Mr. Martino's prior testimony about the organization and structure of Union Carbide's research and development and production facilities at Bound Brook and general background concerning Union Carbide phenolic molding compounds.

10. Susan Carrington

Ms. Carrington did not work for the plastics group of the Union Carbide Corporation, but has familiarized herself with the historical documents and testimony of Union Carbide witnesses relating to the historical manufacture and sale of plastic raw materials, including phenolic molding compounds, at the Union Carbide Bound Brook, New Jersey facility.  If called to testify, Ms. Carrington may testify about various phenolic molding compound and resin products and product lines manufactured by Union Carbide, including, but not limited to, their development, composition, formulas, specifications, manufacture, asbestos content, uses, lifespan, and nature and properties. Ms. Carrington may testify regarding the customers to whom phenolic molding compounds and resins were sold, including the products being manufactured by these customers.   Ms. Carrington may also testify about the organization and structure of Union Carbide's research and development and production facilities at Bound Brook and general background concerning Union Carbide phenolic molding compounds and resins.

As Union Carbide becomes aware of additional facts and the opinions of Plaintiffs' and Cross-Claim Plaintiffs' experts, certain of the experts designated herein may also be asked to testify regarding the additional facts or in response to the opinions of Plaintiffs' and Cross-Claim Plaintiffs' experts.

Union Carbide also incorporates, by reference, the expert witness designations of all other defendants to the extent that such expert testimony is not inconsistent with the positions taken by Union Carbide in the case and/or to the extent that Union Carbide has shared in the cost and/or expense of retaining such experts as a part of joint defense efforts.

Respectfully submitted:

**PUGH, ACCARDO, HAAS, RADECKER, & CAREY, LLC**

*/s/Milele N. St. Julien*
McGready L. Richeson (La. Bar No. 29398)
mricheson@pugh-law.com
Milele N. St. Julien (La. Bar No. 28446)
mstjulien@pugh-law.com
Francis X. deBlanc, III (La. Bar No. 25027)
fdeblanc@pugh-law.com
Kathleen E. Jordan (La. Bar No. 37184)
kjordan@pugh-law.com
1100 Poydras Street, Suite 3300
New Orleans, LA 70163
Telephone: (504) 799-4500
Facsimile: (504) 799-4520
**ATTORNEYS FOR  DEFENDANT, UNION CARBIDE CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record by electronic mail on this 26th day of April, 2021.

/s/ Milele N. St. Julien